UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA – TUCSON DIVISION

| | |
|---|---|
| Lina Silva,<br><br>    Plaintiff,<br><br>v.<br><br>The United States Department of Homeland Security<br><br>    Defendant. | Civil Action No.:_____<br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff LINA SILVA ("Silva" or "Plaintiff"), by and through her undersigned attorneys, brings this action for employment discrimination and retaliation on the basis of her sex pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Silva hereby alleges as follows:

### I. PARTIES, JURISDICTION AND VENUE

1. For all times relevant to this Complaint, Plaintiff Lina Silva was employed as a United States Border Patrol Agent ("BPA") with the United States Department of Homeland Security, Customs and Border Protection Agency (the "Agency").

2. The United States Department of Homeland Security ("DHS") was established in 2002, combining twenty-two (22) different federal departments and agencies into a unified, integrated Cabinet agency. DHS' mission is to prevent attacks and protect Americans - on the land, in the sea and in the air.

3. Upon information and belief, DHS employs more than 240,000 employees in jobs that range from aviation and border security to emergency response, from cybersecurity analyst to

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE:_____
(Rule Number/Section)

chemical facility inspector.

4. This Court has original federal question jurisdiction under 28 U.S.C. §§ 1331 because this case is brought under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. At all times relevant to this action Silva was a resident of the State of Arizona.

5. Venue properly lies in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is also properly laid in this Court pursuant to 28 U.S.C. § 1391 (b)(3) in that Defendant operates and conducts business within the district in which the Court is located and is subject to this Court's personal jurisdiction.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Prior to filing this civil action, Plaintiff timely filed a written charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC").

7. More than 180 days have passed and the EEOC has not issued a final determination.

8. As such, Plaintiff properly brings suit.

## III. GENERAL ALLEGATIONS

9. On or about August 25, 2008, Markham Sylva began his employment with the Agency as a BPA.

10. Markham Sylva's job performance always met or exceeded agency standards. Markham was known as a hard worker and enjoyed a reputation among his co-workers and supervisors as a "good agent" with a strong work ethic. Indeed, in 2013, 2014, and 2015, Markham received cash awards based upon job performance.

11. In September 2016, Markham Sylva took leave without pay.

12. On May 15, 2017, Markham Sylva returned to duty as a BPA with one noticeable

difference: she was now a woman, who went by the name Lina Silva.

***Silva Experiences a Campaign of Sexual Harassment and Discrimination.***

13. Upon information and belief, Plaintiff's co-workers and supervisors came to learn that Silva's leave of absence from the Agency was for the purpose of facilitating her transition from male to female.

14. From the moment Plaintiff returned to work as a female BPA, she experienced crude comments, inappropriate sexual innuendos, and disparate treatment.

15. When Silva returned to the Agency, she was a female and considered to be a female BPA.

16. On or about May 15, 2017, her first day back, while walking down the hall, Silva encountered a supervisor who greeted another co-worker and said, "Good morning ma'am" then looked at Plaintiff and said nodded his head and said "Sir" in a dismissive tone.

17. Plaintiff was also singled out for reprimands based on her new gender. For example, on or about, June 9, 2017 Plaintiff was called and reprimanded by a superior because her hair was "out of regulation and needed to be in a tighter bun", even though Plaintiff's hair was very similar to another female agent's hairstyle who was on duty that morning. The next day, on June 10, 2017 Plaintiff was told that she needed to tone down her perfume because it was a danger to other agents if she were to work in a group with them.

18. Plaintiff was never an agent who was fond of using the department service radio. When Plaintiff went by Markam, her supervisors noted her lack of using the radio, but never an issue related to her fitness as a BPA. However, on June 14, 2017, Plaintiff was told that if she could not belt out a loud voice in the field on the radio, she was unfit to be a BPA.

19. Fellow agents were fixated on Plaintiff's genitals, they would stare at her crotch

and kept referring to her using male pronouns. Agents frequently made comments about Plaintiff and in Plaintiff's presence inquiring whether Plaintiff had "cut it off" in reference to her genitalia.

20. Further, other BPA agents began to regularly ask about Plaintiff's sexual orientation in crude terms.

21. In or around October 2017, Plaintiff was subjected to repeated taunting in common work areas. For instance, a picture was taped to the wall where Plaintiff was assigned to work which depicted a woman in a maid's outfit with a caption that read "[R]eal men clean up after themselves, be a real man."

22. Soon thereafter, Plaintiff learned of a group chat where fellow BPAs regularly communicated with one another – both during work hours and after hours – Plaintiff was referenced when a picture of a transgender female with a large penis coming out of her dress was circulated.

23. Plaintiff reported this harassment to her supervisors.

24. In November 2017, tired of being continually singled out for her transgender status, Plaintiff sought a transfer to a different shift to escape the harassment. Instead of being transferred to another shift, Plaintiff was asked whether she wanted to continue to be a BPA.

25. Eventually, Plaintiff filed a charge with the EEOC. With respect to that charge, mediation was scheduled.

26. On the morning before Plaintiff's EEO mediation, Plaintiff's schedule had not been approved to allow her to attend. Plaintiff went to a supervisor who agreed to adjust her schedule but warned her that other supervisors might try to retaliate against him for assisting her.

27. The mediation took place with no resolution.

### *Plaintiff's Fitness for Duty Was Repeatedly and Unnecessarily Evaluated*

28. Based upon Plaintiff's supervisors and co-workers intense dislike for her

transgender status, Plaintiff was repeatedly subjected to examinations to determine her fitness for duty.

29. On January 3, 2018, BPA Silva attended a required Fitness for Duty exam, which lasted four hours. Ms. Silva passed the Fitness for Duty exam.

30. Despite passing the Fitness for Duty exam just one month earlier (and after a failed EEO mediation) the Agency mandated Plaintiff to take yet another psychological fitness for duty exam.

31. On February 6, 2018, Ms. Silva was evaluated by Barry Morenz, MD. Dr. Morenz's examination consisted of an alleged review of documents, interview of Plaintiff, and a review of Plaintiff's completed MMPI-2 RF (a written psychological test). Dr. Morenz diagnosed Ms. Silva with "Other Specified Personality Disorder", "borderline and narcissistic features (provisional)" and "Alcohol Use Disorder (provisional)." He concluded Ms. Silva was "not fit" to perform all of the essential duties of her position without restriction.

32. The MMPI-2 RF reportedly was interpreted by Richard Frederick, Ph.D. However, this "interpretation" consisted of the preparation of computer generated report, not a personal interpretation based upon evaluation of the examinee. Further, the "interpretation" reportedly included statements that "constitute[d] hypotheses for the primary evaluator to consider in the clinical assessment of the individual who completed the test."

33. Ms. Silva reportedly did not answer 14 questions of 338 total test items. The unanswered questions pertained to spouses and families and Ms. Silva was single with no children and Dr. Morenz advised that questions which were not applicable should be left blank. So, Ms. Silva left those questions blank. Tellingly, the test was reported to have been "invalid for interpretation because of marked defensiveness and guardedness."

34. Despite the fact that the test should have been considered invalidated, on April 4, 2018, Plaintiff was notified that she was not fit for duty. Indeed, the letter she received stated, that

> [o]n February 6, 2018, [Plaintiff was] examined by Barry Morenz, M.D. Dr. Morenz indicated in a report dated February 15, 2018, that [Plaintiff was] not fit for duty. On February 26, 2018, John Zincone, M.D., Reviewing Forensic Psychiatrist reviewed [Plaintiff's] case for a final fitness for duty determination. Dr. Zincone, in agreement with Dr. Morenz concluded that [Plaintiff was] not fit for duty.

35. The letter provided three options to Plaintiff, which included (1) applying for disability retirement; (2) providing an updated copy of Plaintiff's Optional Application for Federal Employment to facilitate a job search for a position that she would adequately meet medical limitations; or (3) resign from her position.

36. On April 25, 2018, Plaintiff informed her superior she wanted to apply for disability retirement.

37. Later that same day, Plaintiff was advised that someone on the Chief's staff would contact her to start putting together paperwork for Plaintiff's disability retirement package. **Despite these written assertions, no one ever contacted Ms. Silva to assist with filling out the required paperwork.**

38. As a result of the April 4 letter, Plaintiff sought out another independent examination. In fact, Dr. Gary Perrin, who has more than 25 years of experience evaluating BPAs and determining fitness for duty, examined Plaintiff.

39. On May 21, 2018, Dr. Perrin declared Plaintiff fit for duty.

40. Plaintiff submitted Dr. Perrin's findings to the Agency for consideration.

41. However, due to Plaintiff's supervisors' and co-workers' failure to accept her status as a transgender woman, these results were ignored.

42. Instead, approximately a month later, on June 20, 2018, Plaintiff received correspondence stating that if she did not submit a disability retirement package, then the Agency would initiate action to separate her from her position. Again, the Chief advised Plaintiff that Human Resources would assist her in preparing the disability retirement package.

43. At the time, Plaintiff was suspended from duty. Accordingly, she did not have access to prepare her disability retirement package with "staff." Moreover, as is custom, other agents are allowed paid time to prepare this package. Yet again, Plaintiff was treated differently from her cisgender colleagues as Plaintiff was not allowed any paid time to prepare this package nor was she granted any access to necessary data to include in this package.

44. On August 14, 2018, Ms. Silva received a letter to advise her that it was the proposal of the Agency that she be removed from her position of BPA. The basis for this decision was Plaintiff's alleged inability to be available for duty on a full time basis and perform the duties of her position.

45. Despite both an oral and written response to the August 14, 2018 letter -- which again informed the Agency of Plaintiff's independent examination declaring her fit for duty -- Plaintiff's independent examination was disregarded.

### *The Agency Applied Different Standards to Cisgender BPAs*

46. In late January 2018, while off duty, Ms. Silva unfortunately was charged with driving under the influence ("DUI").

47. Upon information and belief, at that time, there were other BPAs in the Agency that were also charged with crimes – in fact, these other BPAs were also charged with DUI.

48. On March 20, 2018, Plaintiff received a letter from Chief Patrol Agent Karisch informing Ms. Silva that she was charged with "Conduct Unbecoming, Misuse of Position and Failure to Timely Report Your Arrest" stemming from Plaintiff's DUI.

49. Plaintiff amended her still outstanding EEOC charge on June 14, 2018.

50. Just four days later, on June 18, 2018, was advised that the Agency decided to suspend her effective July 1, 2018 through July 30, 2018 and allow Ms. Silva to return to duty on July 31, 2018.

51. The letter noted Ms. Silva's 14-year history of non-discipline.

52. Notably, other cisgender BPAs who were charged with DUIs were not suspended as a result of being charged with a crime. Simply, Plaintiff's suspension was sustained as a continued form of harassment and discrimination.

53. From the minute Ms. Silva reported her maltreatment to the EEOC, she was singled out, retaliated against, and treated differently than her cisgender colleagues. Specifically, Plaintiff was treated substantially different by Deborah A. Ocasio, a Branch Chief, who Plaintiff reported to while suspended and working in an administrative capacity.

54. For example, BPA Silva had requested, and Ms. Ocasio had approved annual leave, for part of her October 16, 2018 shift. On October 16, 2018, BPA Silva left for part of the day on her pre-approved annual leave. However, BPA Silva experienced an emergency with her car and could not return back for the rest of her shift.

55. It was customary when a BPA was using annual leave part of a shift and who failed to report in timely for the supervisor to contact the BPA and determine if the BPA needed to apply additional annual leave hours if those hours were available. However, Ms. Ocasio never contacted Plaintiff. Instead, she marked BPA Silva AWOL. Once again, Ms. Silva was singled out for treatment that was different than that of her cisgender counterparts.

56. On November 1, 2018, Ms. Ocasio provided Ms. Silva a "Notice of Unsatisfactory Leave Record." Plaintiff was thereafter reprimanded and threatened with being marked AWOL if

she was *one* minute late arriving to the office. Other cisgender colleagues were treated differently; indeed, these collegues were *always* provided annual leave time if they were grossly late.

57. On November 29, 2018, Plaintiff received correspondence that the proposal to remove her from duty was sustained and that her "continued employment and retention are not in the best interest of the Agency and that her termination was effective immediately."

58. Indeed, the decision to remove Plaintiff from her position based on Dr. Morenz and Dr. Zincone's determination. However, Dr. Zincone never interviewed or met with Plaintiff personally and only based his examination on a "peer review" of her file.

59. Plaintiff's termination was a continued act of retaliation for Plaintiff's repeated and consistent reports of the harassment and discrimination, which she experienced since transitioning from male to female.

IV. **CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF TITLE VII - SEX DISCRIMINATION**

60. Silva repeats and realleges by reference each and every allegation contained in the above stated paragraphs, and incorporates the same herein as though fully set forth.

61. In violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, Defendant discriminated against Silva on the basis of sex by subjecting her to a hostile work environment that was severe and pervasive enough to affect the terms and conditions of her employment.

62. Defendant's discrimination against Silva was committed with reckless and callous disregard of his Title VII right to a workplace free from discrimination based on sex.

63. As a proximate result of Defendant's actions, Silva has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, anguish, and other incidental and

consequential damages and expenses.

64. As a proximate result of the Defendant's unlawful conduct, Silva is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## COUNT II
## VIOLATION OF TITLE VII – RETALIATION

65. Silva repeats and realleges by reference each and every allegation contained in the above stated paragraphs, and incorporates the same herein as though fully set forth.

66. By failing to terminating Silva because she participated in a Title VII proceeding by filing a complaint with EEOC, Defendant retaliated against her in violation of Title VII.

67. As a proximate result of Defendant's actions, Silva has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, anguish, and other incidental and consequential damages and expenses.

68. As a proximate result of the Defendant's unlawful conduct, Silva is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this court grant the following relief: compensatory damages in the form of lost wages and employment benefits, punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and costs, and such other relief as this Court shall deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all of the triable issues of fact and damages stated herein.

Dated: September 4, 2020

                          Respectfully submitted,

                          s/Paul Gattone
                          Paul Gattone
                          **Law Office of Paul Gattone**
                          301 S. Convent
                          Tucson, AZ 85701
                          State Bar Number 012482
                          (520)623-1922
                          gattonecivilrightslaw@gmail.com

                          **HACH ROSE SCHIRRIPA & CHEVERIE LLP**
                          Frank R. Schirripa
                          fschirripa@hrsclaw.com
                          *(pro hac vice to be requested)*
                          Hillary M. Nappi
                          hnappi@hrsclaw.com
                          *(pro hac vice to be requested)*
                          112 Madison Avenue, 10th Floor
                          New York, New York 10016
                          Telephone: (212) 213-8311
                          Facsimile: (212) 779-0028

                          *Counsel for Plaintiff Lina Silva*